PAUL N. NIELSEN v. CITY OF ST. PAUL AND ANOTHER.

88 N. W. (2d) 853.

March 14, 1958—No. 37,214.

*Loftsgaarden & Loftsgaarden,* for appellant.

*Marshall F. Hurley,* Corporation Counsel, and *Robert E. O'Connell,* Assistant Corporation Counsel, for respondent city.

*Dennis D. Daly,* for respondent company.

14

NELSON, JUSTICE.

Plaintiff brings this action against the city of St. Paul and the Northwest Flooring Company seeking a temporary and permanent injunction to enjoin said company from performing and the city of St. Paul from paying for performance under the terms of a contract entered into between them. A judge of the district court denied plaintiff's motion for a temporary injunction, and the case came on for trial on the merits before another judge of the same court without a jury. Findings and order for judgment were entered in favor of both defendants. Plaintiff moved the court for amended findings or in the alternative for a new trial, the motion was denied, and plaintiff appeals.

Since recital of some of the facts disclosed by the record appears necessary, we do so in the light most favorable to the prevailing party. The plaintiff is a taxpayer and resident of the city of St. Paul engaged in masonry contracting. He is also the executive secretary of the Masonry Contracting Association in the St. Paul area. The action is brought on his own behalf, and that of other taxpayers similarly situated, to set aside the contract involved on grounds that it was illegally entered into. The city of St. Paul is a municipal corporation operating under a home rule charter. The Northwest Flooring Company, prior to entering into the present contract, was an unincorporated company engaged in cement and masonry contracting. Its articles of incorporation under the same name were filed on June 16, 1955. Plaintiff's claim is based upon the allegations that the competitive bidding requirements of the St. Paul city charter were violated and that as a consequence the contract awarded to the Northwest Flooring Company on a bid submitted by it on May 10, 1955, was illegal.

The city, during the month of April 1955, advertised for bids on certain sidewalk work. The published notice calling for bids provided that the bids on the sidewalk contract, designated as formal bid No. 5089, would be received at the office of the purchasing agent, at the City Hall and Court House, room 253, until 2 p. m. Tuesday, May 10, 1955. Four bids were, pursuant thereto, submitted to the city on that date. The evidence produced at the trial is undisputed that Mr. Lyle Kinvig, the city purchasing agent, even though the bids were scheduled to be received at his office, room 253, had decided that his office was

not large enough to accommodate all bidders that would appear on the day in question and consequently changed the place for the opening of bids to the county board room on the floor directly above. There is testimony in the record that the proceedings concerned with the opening and reading of bids were commenced from 1 to 5 minutes after 2 p. m. The two trial courts so found and there is evidence in the record to support that finding. There were bids on 13 different prospective contracts scheduled to be opened and considered. Chronological numbers were assigned to the various bids called for. The bids on the sidewalk contract would have been the sixth in order of opening, but, due to the large amount of detail contained in the bids on the sidewalk work, the opening of those bids was ordered delayed until the others had been disposed of. The purchasing agent presided and supervised the opening of bids in the presence of a committee representing his own and other city departments.

The evidence indicates that Thomas Gallivan, who testified for defendant Northwest Flooring Company, had entered the employ of that concern shortly before the date set for the filing and opening of bids. He had been sent as a representative of the company to file its bid at the scheduled time and place for the opening of bids. He had been driven to the city hall by Charles W. Coleman, who then operated the Northwest Flooring Company as sole trader, but had been delayed because Fourth Street was in the process of being repaved. Due to St. Peter Street's being blocked off, Gallivan was forced to leave Mr. Coleman in the car and to run the rest of the way in order to reach room 253 on time. He did not take the elevator but ran up the stairway to the purchasing agent's office, arriving there at approximately 2 p. m. After questioning several persons in room 253, he was finally advised that the meeting had been transferred to the third floor and he went there with all due haste. When Gallivan reached the county board room he got the attention of members of the committee who brought the matter to the attention of Mr. Kinvig, the purchasing agent, and he was thereupon permitted to file the bid on behalf of the Northwest Flooring Company. There is testimony in the record that the bid was so received between 1 and 5 minutes after the hour of 2 p.m. There was other testimony that it might have been as much as 10 minutes

16

after the hour of 2 p. m. While Gallivan was in the process of tendering the bid, it was discovered that the envelope was not then sealed. This was called to his attention, whereupon he immediately sealed it and placed it in the hands of the committee charged with opening bids, after which it took the regular course. The evidence is clear that none of the other sidewalk bids submitted had been opened prior to the submission of the bid on behalf of the Northwest Flooring Company and that none of the bids on the sidewalk project were opened until all other formal bids connected with other projects had been opened and considered by the committee. Only thereafter were all sidewalk bids, including that of the Northwest Flooring Company, opened and considered. The opening of the sidewalk bids occurred a substantial period of time after the Northwest Flooring Company bid had been submitted.

It is not disputed that the Northwest Flooring Company proved to be the low bidder or that it had planned to incorporate when it placed its bid and that the office of the corporation counsel of that city and other city officers were advised of that fact. The evidence discloses that the corporation as organized included Charles W. Coleman and two other individuals who had assisted in operating and financing the Northwest Flooring Company on the project; that the stock was issued to the same individuals; that the property and equipment of the Northwest Flooring Company was transferred to the corporation of the same name; and that it became the owner of the equipment and the assets; and that the sidewalk contract received the full backing of the same individuals including the new corporation, the successor of the unincorporated company.

It was shown at the time of the trial that the project was then nearly one-third completed, the city having paid approximately $23,000 of the full contract figure of $78,664. There was no showing that the work had not been performed to the city's complete satisfaction or that the contract in question had resulted in damage or detriment to anyone.

The plaintiff contends: (1) That the evidence conclusively shows that the Northwest Flooring Company bid was not received until a substantial period of time after 2 p. m. on the date in question and this constituted a violation of the city's charter requirements rendering the award invalid; (2) that the competitive bidding process was invalid

because the bids were not opened in the presence of the required officials representing the various city departments; (3) that the contract was not awarded to a corporation in existence at the time the bid was filed and opened and therefore the contract was invalid; (4) that the bid was not presented in a sealed condition as required and therefore the bid was invalid; and (5) that the bond legally required to be submitted by bidders was not properly executed or notarized and therefore a valid contract was not entered into and the bond did not offer to the city the protection which the provisions of the city charter require.

■ Bids for municipal contracts must substantially comply with all requirements relative thereto, as contained in statutes, charter provisions, ordinances, and advertisements. 10 McQuillin, Municipal Corporations (3 ed.) § 29.65. Two judges of the district court have found that, while there may have been a slight deviation from the announced time schedule in this particular instance, nevertheless there was substantial compliance with the call for bids as well as the ordinances and charter provisions of the city of St. Paul. These findings resulted after a hearing on a motion for a temporary injunction and after a trial upon the merits. It is undisputed that the purchasing agent had advertised for bids in accordance with and pursuant to the provisions of St. Paul City Charter, § 297.[1]

---

[1]St. Paul City Charter, § 297, provides:

"All contracts and purchases of supplies are hereby divided into the following classes:

\* \* \* \* \*

"(c) Formal Bids. All purchases or contracts in excess of the sum of five hundred ($500.00) dollars shall be made only upon competitive sealed bids and after advertisement therefor in the official newspaper for at least once a week for two successive weeks. Such advertisement shall state the kind and quantity of articles desired and the quality thereof either in full or by reference to the standard specifications, the time and places for the filing and opening of bids. All formal bids shall be made on forms provided by the purchasing agent, shall state the price, the quantity and quality of each article bid on, and shall be sealed, but may be as to one or all of the articles named in the advertisement and shall also be filed at the time and place therein designated. All bids shall be publicly opened by the purchasing agent at the time and place named in the advertisement in the presence of the mayor and the comptroller or their representatives and such

This court in the recent case of Griswold v. County of Ramsey, 242 Minn. 529, 534, 65 N. W. (2d) 647, 651, said that:

"* * * Subject to certain exceptions pertaining to personal services involving specialized knowledge and personal skill and to supplies of a peculiar character, the public welfare is ordinarily best served, in the absence of emergencies, by letting construction contracts to the lowest qualified bidder whereby all competitive contractors are given an equal opportunity and the taxpayers are assured of the best bargain for the least money."

The legislature has prescribed the methods available to a municipality in the exercise of its discretionary powers. The prescribed procedure to be followed by the city of St. Paul in calling for bids on sidewalk construction is found in its city charter and ordinances.

The awarding of a contract is an administrative act of discretion vested by law in the governing authorities of the city. When and if the court's power is called upon it is to prevent the doing of an unlawful act in that respect. There is no provision for an appeal to the courts from an act of the city authorities in respect to such matters. The courts may be called upon, irrespective of what lawful methods may have been adopted or used in the letting of public contracts, to determine whether officials in the exercise of their discretion have applied the method used in an arbitrary, capricious, or unreasonable manner. But the courts cannot direct the authorities as to how they shall exercise that discretionary power, nor direct to whom they must let a contract. They may only enjoin them from doing so illegally, which must include an arbitrary, capricious, or unreasonable exercise of power.

Referring again to Griswold v. County of Ramsey, *supra,* it is to be noted that we said in that case (242 Minn. 535, 65 N. W. [2d] 652):

"Generally it is presumed that public officials have entered into public contracts in good faith and actual fraud in a particular instance must be proved, but this rule has no application in a determination of

other persons as may be present; in the case of school purchases, bids shall be opened in the presence of the comptroller and of the Board of Education or their representatives."

whether the requirements of competitive bidding have been met in the letting of a contract and, as a matter of sound public policy, such a contract is void, without any showing of actual fraud or an intent to commit fraud, if a procedure has been followed which emasculates the safeguards of competitive bidding." Townsend v. McCall, 262 Ala. 554, 80 So. (2d) 262.

The essentials of competitive bidding are to be found in recent cases decided in this court, and it is not necessary here to review all the essentials.[2] We will only refer to certain essential features.

In the Griswold case the county board, although not required to do so, had adopted competitive bidding, and under the circumstances this court held that, since that method had not been seasonably abandoned, it was required to pursue such method in a manner *reasonably designed to accomplish its normal purpose of giving all contractors an equal opportunity to bid and of assuring to the taxpayers the best bargain for the least money.* If accomplishment of this normal purpose finds support in the record, as we think it does here, it is futile to argue that the municipal authorities did not pursue competitive bidding in the manner provided and contemplated by the city charter provisions.

■ The charter provisions of the city of St. Paul regulating competitive bidding were designed for the benefit of the city and to protect the public, to make certain, as far as possible, that the taxpayers would be assured of the best bargain for the least money.

The defendants contend that in the instant case the bid was sealed before it was actually received; that there was substantial compliance as to time; and that no bidder derived any advantage over any other bidder relative to the terms or amounts of the bids. It may well be contended that, had the purchasing agent remained at the room designated for the filing and for the opening of bids, the determination of the lower court would have been that the bid of the Northwest Flooring Company had been regularly filed not later than 2 p. m. It seems clear that the procedure taken after Mr. Gallivan reached the room to which

---

[2]See, Otter Tail Power Co. v. Village of Elbow Lake, 234 Minn. 419, 49 N. W. (2d) 197, 27 A. L. R. (2d) 906; Coller v. City of St. Paul, 223 Minn. 376, 26 N. W. (2d) 835.

the opening of bids had been changed provided no advantage to any one bidder over any other bidder. The fact that the Northwest Flooring Company's bid was handed to the purchasing agent in sealed form from 1 to 5 minutes after 2 p. m. and that none of the sidewalk bids were opened for consideration until a substantial period had elapsed following receipt of the last bid did not prohibit the municipal authorities, in the exercise of their discretion, from receiving the bid here involved in good faith nor from thereafter determining that it was the lowest responsible bid received.[3]

In Critchfield v. Jersey City, 4 N. J. Misc. 299, 132 A. 321, an attempt was made to have a paving contract set aside on several grounds including the fact that bids were received at an hour different from that specified in the notice calling for bids. The hour set for the meeting was 3 p. m. and it was some 10 minutes later that the meeting was opened and bids received. The court stated that it did not consider such attack to be meritoriously substantial.

In Bryan Const. Co. v. Board of Trustees etc. of Town of Montclair, 31 N. J. Super. 200, 206, 106 A. (2d) 303, 306, the award of a contract was attacked on the ground that the successful bidder had accompanied its bid with a bid bond rather than a certified check, and the New Jersey court in upholding the award said:

"* * * a municipal body has a greater function in dealing with irregularities in such matters than merely exercising a ministerial and perfunctory role. It has inherent discretionary power, and what is more, a duty to secure, through competitive bidding, the lowest responsible offer, and to effectuate that accomplishment it may waive minor irregularities.

" 'Mere irregularity of a bid will not justify its rejection by a municipal body charged with a duty of awarding a contract to the lowest bidder. The form of the bid, not being embodied in the statute,

---

[3]Fact that bids are tendered and received a few minutes after time set may not be fatal. See, 63 C. J. S., Municipal Corporations, § 1153.

In Townsend v. McCall, 262 Ala. 554, 80 So. (2d) 262, it was held that, after a readvertisement for bids, a bid submitted 20 minutes after hour specified, but before any bids were opened, could be received.

is a regulation prescribed by the city; and failure to technically comply with the form required will not defeat the right of the lowest bidder, to have the contract, if, after the bids are opened, it appears there has been a substantial compliance with the requirements, and he tenders himself ready to execute the requisite contract and furnish responsible bondsmen or good security, as was the fact in this case. The statute is intended to secure to the city the contracting of the work to the lowest responsible bidder, and mere irregularities in the form of the bid, or details of statement, which do not in any way mislead or injure, are not sufficient to justify the rejection of such a bid. It is in the interest of the public that the lowest bid, though it be irregular, be accepted, and, if necessary, that the bidder have opportunity to correct an irregularity, while not changing the substance of his bid.' Faist v. City of Hoboken, 72 N. J. L. 361, 60 A. 1120 (Sup. Ct. 1905)."

The amount of the sidewalk contract awarded to the lowest responsible bidder in the case at bar was $78,664. The accepted bid was virtually $2,000 less than the next low bid. It will have to be conceded that, had not this low bid been accepted and the contract awarded and performed as it has been, the city officers might well have been criticized for not pursuing a competitive-bidding method designed to accomplish its normal purpose of giving all contractors an equal opportunity to bid and of assuring to the taxpayers of the city of St. Paul the best bargain for the least money.

The record does not disclose the appearance of anyone in opposition to the sidewalk project. Neither does our search of the record, nor the consideration of the evidence as a whole, as we view it, permit any legal inference that any official or member of the committee responsible for receiving, opening, and awarding bids acted in secret or other than in good faith; substantially responsive to the duties to the public; and consistent with charter and ordinance requirements.

We come to another of plaintiff's contentions; i.e., that the competitive bidding was invalid because the bids were not opened in the presence of the required persons. The plaintiff's claim is based upon the alleged absence of the commissioner of public works to whose department is assigned the construction of sidewalks. See, St. Paul City

Charter, §§ 324, 327, 328. The last sentence of § 297(c) of St. Paul City Charter provides:

"* * * *All bids shall be publicly opened by the purchasing agent at the time and place named in the advertisement in the presence of the mayor and the comptroller or their representatives and such other persons as may be present; * * *.*" (Italics supplied.)

Section 312(a) provides:

"All bids shall be opened in the presence of the comptroller or his representative, the purchasing agent and the head of the department most directly concerned in the contract."

With respect to the provision that all formal bids shall be publicly opened by the purchasing agent at the time and place named in the advertisement, there was substantial compliance even though the place for opening the bids was changed from room 253 to the county board room on the third floor of the city hall. The record indicates that in addition to the city purchasing agent there were present two employees from the purchasing agent's office, the deputy city comptroller, a member of the city corporation counsel's staff, and two employees from the department of public works. It is clear that the provisions regarding who shall be present contained in both § 297(c) and § 312(a), without any explanation of the duplication, present an inconsistency and render the provisions ambiguous. Section 297(c) clearly provides that bids shall be opened before city officers or their representatives. Section 312(a) provides that bids shall be opened before at least one different officer and, if taken in its literal sense, that only the comptroller may be represented.

In Lowry v. City of Mankato, 231 Minn. 108, 113, 42 N. W. (2d) 553, 557, this court in enunciating a rule applicable to similar situations said:

"Where there are conflicts in the provisions of a statute or ordinance, the conflicts should be harmonized and reconciled in such a manner, if possible, as to give effect to the principal and more important clauses manifesting the policy or purpose thereof. As we held in Sandy v. Walter Butler Shipbuilders, Inc. 221 Minn. 215, 223, 21 N. W. (2d)

612, 616, the policy as well as the letter of a statute (and that includes an ordinance) is a guide to the construction thereof, and the process fails of its true function if a literal reading results in emasculation or deletion of a provision which a less literal reading would preserve."

In State ex rel. Laurisch v. Pohl, 214 Minn. 221, 223, 8 N. W. (2d) 227, 229, this court said:

"* * * There is no universal rule by which directory provisions in a statute may, under all circumstances, be distinguished from those which are mandatory. Consideration must be given to the legislative history, the language of the statute, its subject matter, the importance of its provisions, their relation to the general object intended to be accomplished by the act, and, finally, whether or not there is a public or private right involved."

In People ex rel. Rodgers v. Coler, 35 App. Div. 401, 403, 54 N. Y. S. 785, 786, relied upon by plaintiff, the court said, "The absence of the comptroller may be excused, but the absence of the officer advertising for the bids cannot be dispensed with." Of course we recognize that the purchasing agent, who advertises for the bids and is charged with the responsibility of presiding at the opening of the bids, cannot be dispensed with. There was no committee present in the Rodgers case and the court in that case simply refused to compel the comptroller to act. In the later New York case of McCord v. Lauterbach, 91 App. Div. 315, 86 N. Y. S. 503, objections had been raised on appeal based upon certain irregularities, the act of a notary in attaching his signature to certain affidavits not signed before him involving statements as to sureties and their qualifications. It was argued that these irregularities were sufficient to call upon the trustees to reject a certain bid. It appeared that it was to the pecuniary advantage of the city to act upon it. The court held that this was undisputed and that the city ought not to be deprived of the right thus presented to make an advantageous contract, unless a controlling rule of law interposed to compel it. The court then said (91 App. Div. 320, 86 N. Y. S. 507):

"* * * *All of the provisions, both of the statute and of the rules and*

24

*regulations which have been adopted for procuring genuine bids and responsible parties, are in the main for the benefit of the city and in order to prevent frauds upon it. They have not been adopted for the protection of the bidder, but for the protection of the city, and it necessarily follows that the city, to some extent, at least, has the right to waive irregularities when it is clearly for its benefit so to do and when no damages will be inflicted upon it or wrong done to others thereby.* In the present case there is no claim that there was any collusion, or fraud, between the bidder and the city, or those advertising for bids. The fraud which is averred to exist is such as arises out of the transaction itself and it comes into being by operation of law, if at all. There is no pretense that any fraud or collusion existed as matter of fact, and such being the case it would seem to follow that no one can be injured by the trustees acting upon this bid and executing the contract." (Italics supplied.)

Here, there was at least a full compliance with § 297(c) of the city charter. It appears that a majority of the committee of city officers, or their representatives, charged with opening of bids were present as were others appearing in a representative capacity from the city departments. It can hardly be seriously contended that in that respect the taxpayers of the city were not adequately protected. The irregularity, if there was in fact an irregularity, was one which might well have been waived if it was clearly for the city's benefit to do so, it being clear that no damages would be inflicted upon it and no wrong done to others thereby. We do not believe any irregularities exist here detrimental or prejudicial to the plaintiff or any other taxpayer and clearly under the inconsistency and ambiguity created as between §§ 297(c) and 312(a) it should not be required that a literal reading of § 312(a) should alone be adopted thus placing an onerous burden on city government which the general provision as to formal bids under § 297(c) does not require. Harmonizing the inconsistency which exists between §§ 297(c) and 312(a), as we must, we now conclude that the official and committee representation was adequate and that the taxpayers were adequately protected. The trial court was not in error in ruling upon that question as it did.

■ Plaintiff complains that the Northwest Flooring Company was not a corporation at the time the bid was filed and the award made, and therefore whatever contract the city of St. Paul entered into with the corporation was an invalid contract. The evidence discloses that the bid submitted was made by the Northwest Flooring Company, Charles W. Coleman, 875 Aurora Avenue. The bond later issued was signed Northwest Flooring Company, Charles W. Coleman, President, on behalf of the principal and by the Hartford Accident & Indemnity Company, D. C. Carlson, attorney-in-fact, on behalf of the surety and the contract. The contract also was signed Northwest Flooring Company, Charles W. Coleman, President. In the body of both the contract and the bond, the Northwest Flooring Company was identified as a corporation. It is true it appears that the certified check submitted with the bid was signed by Lawrence P. Merten and on the face of the check there was written "N. W. Flooring Company." Charles W. Coleman testified that he and his father and Mr. Merten had agreed to submit a bid to the city seeking to obtain the contract in question, and that they had agreed that if they were successful in obtaining the bid they would form a corporation for the purpose of carrying on the cement contracting business. They were the successful bidder under the name of Northwest Flooring Company and thereafter proceeded with an intention they had theretofore made known. The articles of incorporation were filed the same day that the required bond was signed by D. C. Carlson on behalf of Hartford Accident & Indemnity Company and the same day that the bond was approved as to form and execution on behalf of the city of St. Paul. The bond was approved as to surety by Finance Commissioner Norris O. Halvorson on June 9, 1955.

The general rule is stated in 10 McQuillin, Municipal Corporations (3 ed.) § 29.65, as follows:

"* * * Although, as a general rule, a contract may not be awarded to one other than the signer of the bid, it seems that in some circumstances the bid of a subsidiary company may constitute a bid by the parent corporation."

In 13 McQuillin, Municipal Corporations (3 ed.) § 37.109, another

general rule is stated as follows:

"The fact that at the time of making a contract for public work the contractor made the contract for the benefit of another is immaterial in an action thereon. Public work may be obtained in the name of another, and the one so obtaining it may become surety on the contract. This is not a fraud on the municipality."

We quote the following language from 4 Dunnell, Dig. (3 ed.) § 1977, which we think indicates a recognition of the procedure undertaken by the Northwest Flooring Company in following up its bid for a contract by incorporation and that in such a case additional protection is afforded in the execution of this contract under the circumstances. The statement in Dunnell is as follows:

"* * * Expedient of adopting a corporate business structure, having same name, property, and purposes as a former partnership or individual, will not be effective to purge organizers in their corporate capacity of indebtedness previously incurred in some other capacity, and doctrine applies although corporation was not organized but acquired by purchase. Generally, persons dealing with promoters are given the double security of promoters in the first instance and the corporation when it comes into existence and assents to the contract."

The record indicates that here a sole trader, operating as the Northwest Flooring Company, together with two other persons who had become associated in making the bid incorporated, the resulting corporation taking over all equipment and assets and continuing the same business at the same place with the same name and substantially the same ownership. It cannot be said that equitably there is not a strong inference that the corporation assumed the liabilities of the sole trader, Northwest Flooring Company. Since Charles W. Coleman, operating the prior Northwest Flooring Company, acted jointly with his two other business associates in placing the sidewalk bid, we think it may be said generally that the original parties who placed the bid have simply put on a new coat through its corporate successor the Northwest Flooring Company, a corporation. It follows therefore that the expedient of adopting a corporate business structure, having the same name, proper-

ties, and purposes as the former Northwest Flooring Company, operated by Charles W. Coleman and assisted by his father and one Lawrence P. Merten, individuals, will not be effective to purge the organizers in their corporate capacity of the obligations previously incurred in their individual capacity as the bidder. We conclude that such doctrine applies here even though the articles of incorporation were not filed until June 16, 1955, and even though the only written contract entered into was the contract bearing a prior date. We hold that the Northwest Flooring Company, a Minnesota corporation, was in all respects the successor of the Northwest Flooring Company, a sole trader, and that its execution of the performance contract pursuant to the award to the Northwest Flooring Company as the lowest responsible bidder was binding and valid.[4]

Plaintiff's contention that the bid was not presented in a sealed condition does not have support in the record as the facts indicate that even though it may originally have appeared to be unsealed, Mr. Gallivan was required to reseal it before it was accepted by the purchasing agent and placed in line with the other sidewalk bids.

■ Plaintiff contends that the city was not amply protected by a valid and binding performance bond, that the performance bond was not notarized and therefore the city had not been provided the protection which the provisions of the city charter and the ordinances require. Ordinarily the neglect of merely formal and ministerial acts in the execution of a contract will not invalidate it. The absence of a notarial seal at the time this irregularity was discovered was not of great importance since this would be nothing more than a formal irregularity or defect which could be supplied at any time. The same would be true as regards the absence of a notarial seal with reference to a corporate acknowledgment. The attaching of a notarial seal is nothing more than a clerical duty on the part of the notary which he can be compelled to perform by those entitled to demand it. While it is required

---

[4]The conclusions reached find support in Fena v. Peppers Fruit Co. 185 Minn. 137, 239 N. W. 898; Range Ice & Fuel Co. Inc. v. Barnsdall Oil Co. 209 Minn. 260, 296 N. W. 407; Blumenthal v. Schneider, 186 Wis. 588, 203 N. W. 393; Luebke v. City of Watertown, 230 Wis. 512, 284 N. W. 519.

that the contract must be actually executed on behalf of the municipality, if it appears that the contract is the contract of the municipality, it will be so treated although it might be defective concerning the form of signature. It seems to be well established that mere irregularities and formal defects in a contract for public work between the municipality and the contractor cannot be urged by third parties to invalidate the contract, such for instance as failure of designated officer to countersign the contract. In Kuennan v. United States F. & G. Co. 159 Mich. 122, 123 N. W. 799, wherein a construction company submitted a proposal to construct a public work and gave a bond for the performance of the work in which reference was made to "the foregoing contract" and the proposal, contract, and bond were so attached, and by references in each were so connected, as to constitute practically one transaction, the Michigan court held that there was a valid contract although it was not formally executed by the construction company. See, 13 McQuillin, Municipal Corporations (3 ed.) § 37.108. In the instant case the bond was approved as to form and execution on behalf of the city by the city attorney's office and as to surety by the commissioner of finance June 9, 1955.

It is stated in 18 Dunnell, Dig. (3 ed.) § 9107c, dealing with the subject of "Contractors' bonds," that:

"The liability of surety companies on contractors' bonds is governed, in part at least, by the law of insurance rather than the law of suretyship. In some respects such bonds are practically policies of insurance. The strict rules of construction which are applied in determining the liability of ordinary sureties are not applicable to surety companies." (See cases cited thereunder.)

Here, we are dealing with a public contractor's bond wherein the municipality has omitted some prescribed formality for entering the contract; but the work contemplated was lawful and the parties have proceeded to perform. In similar situations this court has held that the surety was not in a position to attack the contract which his bond recognized as having been duly made.

The recital in a bond which is certain in its terms and relevant to the matter in hand is conclusive between the parties to a controversy

growing out of the instrument itself, or the transaction in which it was executed, and, after the bid has been accepted and approved, the bond may be executed before the contract or the contract before the bond. We have heretofore held that a surety who obligates himself to secure the performance of a contract is estopped from asserting that the contract is void. If an officer of a municipal corporation is one who has no discretion in the premises, but nevertheless is required to countersign as to either the bond or the formal contract, his countersigning then constitutes nothing more than a clerical duty, the performance of which can be compelled by the contractor or the municipal authorities who have the discretion in the premises. County of Le Sueur v. Globe Ind. Co. 150 Minn. 120, 184 N. W. 677; Red Wing Sewer Pipe Co. v. Donnelly, 102 Minn. 192, 113 N. W. 1; Jefferson v. McCarthy, 44 Minn. 26, 46 N. W. 140; State ex rel. Benz v. District Court, 32 Minn. 181, 19 N. W. 732. While the matter has been alluded to, neither is there any import to be placed upon the fact that the Northwest Flooring Company is a corporation which has not procured a seal inasmuch as there is no mandatory requirement under our law to compel a business corporation to have and use a seal. M. S. A. 301.09.

The burden is on the plaintiff here to show that there is no substantial evidence reasonably tending to sustain the trial court's findings. To justify the reversal of a refusal to make amended findings, it is not enough to show that there was evidence to justify the proposed amended findings had they been made. It is of course incumbent upon this court to search the record to ascertain whether any erroneous rules of law have been applied and act accordingly, but this court must on appeal consider the testimony in the light most favorable to the prevailing party. If the evidence as a whole tends to support the findings they should not be disturbed. The findings of the trial court are entitled to the same weight as the verdict of a jury and will not be reversed on appeal unless they are manifestly and palpably contrary to the evidence, and such rule applies whether the appeal is from a judgment or from an order granting or denying a new trial.[5]

[5]Bolduc v. New York Fire Ins. Co. 244 Minn. 192, 69 N. W. (2d) 660; Prince v. Sonnesyn, 222 Minn. 528, 25 N. W. (2d) 468; Bicanic v. J. C.

After full consideration of the legal issues presented by this appeal, we reach the conclusion that the findings of fact and the conclusions reached by the trial court find ample support in the evidence. The trial court's order denying plaintiff's motion for amended findings or in the alternative for a new trial should not be disturbed.

Affirmed.

Campbell Co. 220 Minn. 107, 19 N. W. (2d) 7; Bang v. International Sisal Co. 212 Minn. 135, 4 N. W. (2d) 113, 141 A. L. R. 657; 1 Dunnell, Dig. (3 ed.) § 411, and cases cited.